E-FILED
Monday, 05 September, 2022  10:05:35 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD

| | |
|---|---|
| Mary Moore, individually and on behalf of all others similarly situated, | 3:22-cv-03172 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Kellogg Sales Company, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.      Kellogg Sales Company ("Defendant") manufactures, markets, labels and sells lightly toasted, dark and mottled crackers with specks of what appear to be pieces of grain, identified as "Harvest Wheat" under the Kellogg's Toasteds Crackers brand ("Product").



2.      The representations cause consumers to expect it contains a greater absolute and relative amount of whole grains compared to refined grains than it does.

## I.   CONSUMERS VALUE WHOLE GRAINS

3.      Consumers increasingly prefer whole grains to non-whole, or refined, grains.

4.      Whole grains are nutritionally superior to non-whole grains because they include the entire grain seed, consisting of the endosperm, bran, and germ.

5.      The bran and germ contain important nutrients like fiber, vitamins, minerals, and antioxidants, such as iron, zinc, folate, magnesium, thiamin, niacin, selenium, riboflavin, manganese, copper, vitamin A, and vitamin B6.

6.      In contrast, "non-whole grains" or "refined grains" have been processed to remove the bran and germ, thereby removing the fiber and most other nutrients.

7.      Most refined grains are enriched, a process that adds back some of the previously removed iron and B vitamins, such as thiamin, riboflavin, niacin, and folic acid.

8.      Other nutrients, including fiber, vitamin E, vitamin B6, vitamin K, magnesium, manganese, potassium, phosphorus, copper, calcium, and selenium, are not added back.

9.      Where flour is made of refined grains, which only contains the endosperm and mainly starch, it is white in color ("white flour").

## II.   CONSUMERS EXPECT FIBER FROM PRODUCTS REPRESENTED AS WHOLE GRAIN

10.     The 2015-2020 Dietary Guidelines for Americans recommend that at least half of all grains eaten be whole grains.

11.     The Dietary Guidelines recommend consuming 48g of whole grains and 28g of fiber per day.

12.     The Dietary Guidelines promote whole grains as an important source of fiber.

13.     87% of consumers try to consume more whole grains and 92% try to get more fiber.

14.     Research, including studies conducted by Defendant, proves that consumers seek

whole grains because they want more fiber.

15.    In surveys, more than 60% of consumers stated they want to consume more whole grains to improve their digestive health, which is reflective of a desire to increase fiber intake.

16.    Almost 75% of consumers who are presented representations which contain express and implied representations that a product is made with, or contains whole grains, will expect that food to be at least a good source of fiber – 10% of the daily value.

17.    Almost 70% of consumers agree with the statement that whole grains are one of the best sources of fiber.

18.    62% of consumers agree that foods made from whole grains are one of the best sources of fiber.

19.    46% of consumers rely on foods with whole grains for their daily fiber needs.

20.    Based on the proven connection with fiber, consumers expect foods represented – directly or indirectly – as whole grain, do more than tell consumers a product contains a type of grain ingredient.

## III.    CONSUMER CONFUSION ABOUT WHOLE GRAINS

21.    Despite consumers' desire to consume more whole grains, a recent study in the journal, Public Health Nutrition, concluded that labeling practices stymie these efforts.

22.    The study found that the most significant information considered by consumers in comparing foods with different amounts of whole grain was not the ingredient list or nutrition facts, but the front label.

23.    When products used terms like "multigrain" or "wheat" on the front label, between thirty to fifty percent of participants believed these foods had more whole grains than products without such names.

24.     According to a food economist and professor at Tufts University, the words used on wheat products can cause consumers to be misled as to the relative amount of whole grains compared to refined grains.

25.     For instance, products labeled "multigrain" and "Twelve Grain" by definition contain more than one type of grain.

26.     However, consumers expect that besides regular refined grains, the primary grains in those products are whole grains.

27.     Instead, they are mostly refined grains with a *de minimis* amount of whole grains.

28.     Other potentially misleading terms include "wheat," "milled wheat," "stoned wheat" and "stoned ground grain."

29.     These terms have no formal definition about how much whole grain they contain.

30.     For instance, "stoned [wheat]" implies a primitive form of processing, i.e., with stones.

31.     This is in contrast to the advanced technology and machinery used to create refined grains, or white flour.

32.     The result is that consumers expect grain products described and promoted with the word "stone[d]" to contain mostly whole grains, because they are presumed to be less processed than refined grains.

33.     Another term which contributed to consumer misunderstanding about whole grains is "honey wheat."

34.     The Public Health Nutrition study found that 43% of respondents believed at least

half to all of the grains in a "honey wheat" product was whole grains.[1]

35.     However, the amount of whole grains was negligible.

36.     Consumers believed "honey wheat" was a type of wheat, and the term "honey" referred to its amber color, darker than regular wheat.

37.     Where grains and wheat are described with the term "harvest," i.e., "harvest grain" and "harvest wheat," consumers expect mostly whole grains.

38.     This is because the word "harvest" is defined and understood as "the process or period of gathering in crops."

39.     By emphasizing the "harvest" in "harvest grain" and "harvest wheat," consumers expect that the wheat and grains they are consuming is closer in form to its original "harvest" state than after it is fully refined.

40.     After all, all grains are initially harvested, but it is their subsequent refining – the removal of the bran and germ – that strips away the nutrients of harvested grains.

41.     The public health advocacy group, Center for Science in the Public Interest ("CSPI"), noted that terms such as "harvest grain" was misleading to consumers, who expected it meant a product contained a predominant amount of whole grains.[2]

42.     One food and nutrition professor stated, "Even people with advanced degrees cannot figure out how much whole grain" is in products represented to consumers as whole grain.

43.     The FDA and Federal Trade Commission ("FTC") have cautioned companies against misleading consumers as to the relative amounts of whole grains in foods, through methods

---

[1] Parke Wilde, et al. "Consumer confusion about wholegrain content and healthfulness in product labels: a discrete choice experiment and comprehension assessment." Public Health Nutrition 23.18 (2020): 3324-3331.
[2] CSPI, Comments to 2006 FDA Draft Guidance on Whole Grain Labeling.

including the use of non-standardized names for wheat and added dark coloring.

44.    Both agencies – based on numerous studies and research – know that when consumers are presented with products that reference or allude to whole grains on the front label, consumers will expect those foods to get between half and all of its grain content from whole grain.

## IV.    PRODUCT NOT WHOLE GRAIN

45.    Despite the labeling of the Product as "Harvest Wheat," with a dark brown color, and visible pieces of grains, the Product contains a negligible absolute and relative amount of whole grains compared to refined grains.

46.    This is revealed in part from the fiber content shown on the Nutrition Facts as less than 1g per serving, or 2% of the Daily Value.



47.    This is further confirmed by the ingredient list, which reveals that the most predominant ingredient is "Enriched flour."

Ingredients: ==Enriched flour== (wheat flour, niacin, reduced iron, vitamin B1 [thiamin mononitrate], vitamin B2 [riboflavin], folic acid), **soybean oil** (with TBHQ for freshness), ==whole wheat flour==, **sugar, defatted wheat germ,** ==whole wheat.== **Contains 2% or less of** salt, corn syrup, leavening (baking soda, sodium acid pyrophosphate, monocalcium phosphate), malt extract, dried onion, whey, soy lecithin.

48.    The Product contains more soybean oil than the total amount of whole grains, listed third and fifth as "whole wheat flour" and "whole wheat."

49.    That the amount of soybean oil exceeds the combined total of whole grains is based on an analysis of the values indicated on the Nutrition Facts coupled with the ingredient density based on standardized measurements.

50.    Since the amount of soybean oil exceeds the sum of the two listed whole grain ingredients, the Product cannot contain more whole grains than refined grains, because enriched flour is the predominant ingredient.

51.    Neither the ingredient list nor the Nutrition Facts tells consumers the Product contains more refined grains compared to whole grains and the amount and percent of grains which are refined relative to whole.

## V.    INGREDIENTS USED TO DARKEN COLOR AND GIVE APPEARANCE OF MORE WHOLE GRAINS

52.    Studies have shown that consumers seeking whole grains look for products darker in color with visible grains.

53.    A recent study participant stated, "For me I like to look at the color," and "I like to

be able to see the grains" to find out if a food is mainly whole grain.

54.     This is a natural tendency, because whole grains contain bran to give it a distinctive brown coloring.

55.     In contrast, refined grain products are not brown and associated with white flour, which is white and smooth.

56.     The Product contains several ingredients which alter its physical appearance so that consumers will expect the "Harvest Wheat" crackers depicted on the label are predominantly whole grain.

57.     The first of these ingredients is malt extract, which makes the Product significantly darker than it would be if only based on the amount of refined to whole grains.

58.     This is because malt extract is a dark brown liquid, and its reducing sugars and free amino acids participate in the Maillard browning reaction.

59.     One prominent manufacturer declared that "Malt extract convinces all along the line," referring to making consumers believe a product's darker color was due to its substantive ingredients, such as whole grain.

60.     The second ingredient is defatted wheat germ, present in an amount greater than "whole wheat."

61.     The addition of defatted wheat germ results in the Product being mottled with darker spots, specks, and what appear to be visible pieces of grain.



62.    Industry publications praise defatted wheat germ as recognized to "help[s] manufacturers of wheat-based products cut down on costs" by using less whole grain and giving consumers the impression a product contains more whole grain.

63.    According to a November 2019 article in Food Business News, the tan to dark color of defatted wheat germ and its "granular particle size gives a wholesome appearance and texture to baked foods such as crackers."

64.    Consumers viewing these brown specks will believe they are there because the Product is predominantly whole grain and/or contains a non-de minimis amount of whole grain, when this would be false.

## VI.   CONCLUSION

65.    Defendant makes other representations and omissions with respect to the Product which are false and misleading.

66.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

67.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

68.     Plaintiff paid more for the Product than she would have in the absence of the false and misleading representations and omissions, and would not have bought it or paid less.

69.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $3.69 for 8 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

70.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

71.     The aggregate amount in controversy exceeds $5 million, including sales, statutory and punitive damages, injunctive relief, and attorney's fees, exclusive of interest and costs.

72.     Plaintiff Mary Moore is a citizen of Illinois.

73.     Defendant Kellogg Sales Company is a Delaware corporation with a principal place of business in Battle Creek, Calhoun County, Michigan.

74.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

75.     The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in thousands of locations, in the States covered by Plaintiff's proposed classes.

76.     The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

77.     Venue is in this District and assignment is to Springfield because a substantial part of the events or omissions giving rise to these claims occurred in Sangamon County, including Plaintiff's purchase, consumption, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

78.     Plaintiff Mary Moore is a citizen of Springfield, Sangamon County, Illinois.

79.     Defendant Kellogg Sales Company is a Delaware corporation with a principal place of business in Battle Creek, Calhoun County, Michigan.

80.     Kellogg's is one of the largest food manufacturers in the world.

81.     Kellogg's founding was based upon its desire to improve the health of medical patients, leading to the innovative corn flakes cereal.

82.     The original founder, W.K. Kellogg, believed that a food's ingredients determined its quality, and always prioritized transparency and honesty to his customers.

83.     For over a hundred years, American families have trusted Kellogg's products, which have become part of the fabric of American life.

84.     Consumers trust Kellogg's because they know its brand represents a commitment to nutrition, backed by science.

85.     Defendant spends millions of dollars each year on consumer research to identify attributes of products consumers want and will pay more for.

86.     Defendant's internal and external studies confirm that consumers increasingly seek foods which contain a greater absolute and relative amount of whole grains compared to refined

grains, and correspondingly sufficient amounts of fiber.

87.    Plaintiff seeks to consume more whole grains, and tries to purchase foods which contain more whole grains than refined grains.

88.    Plaintiff relies on the front label of foods, including product names, descriptions, and images, to tell her quickly, when at the store, if a food will contain a non-de minimis amount of whole grains.

89.    Plaintiff purchased the Product at locations including Walmart, 2760 N Dirksen Pkwy, Springfield, IL 62702, between July 2022 and September 2022, among other times.

90.    Plaintiff believed and expected the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

91.    Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

92.    Plaintiff bought the Product at or exceeding the above-referenced price.

93.    Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

94.    Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or

12

composition.

95.    Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar whole grain products, because she is unsure whether those representations are truthful.

Class Allegations

96.    Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Kansas, New Hampshire, Nebraska, Virginia, South Carolina, Montana, Iowa, Mississippi, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

97.    Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

98.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

99.    Plaintiff is an adequate representative because her interests do not conflict with other members.

100.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

101.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

102.   Plaintiff's counsel is competent and experienced in complex class action litigation

and intends to protect class members' interests adequately and fairly.

103.  Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act</u>
<u>("ICFA"), 815 ILCS 505/1, et seq.</u>

104.  Plaintiff incorporates by reference all preceding paragraphs.

105.  Plaintiff believed the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

106.  Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

107.  Plaintiff relied on the representations and omissions to believe the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

108.   Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>
<u>(Consumer Fraud Multi-State Class)</u>

109.  The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices.

110.  Plaintiff and/or members of the Consumer Fraud Multi-State Class reserve their rights to assert consumer protection claims under their State Consumer Fraud Acts and/or the consumer protection statute invoked by Plaintiff.

111.  Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

**Breaches of Express Warranty,**
**Implied Warranty of Merchantability/Fitness for a Particular Purpose**
**and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.***

112.   The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

113.   Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

114.   Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

115.   Defendant's representations were conveyed in writing and promised the Product would be defect-free, and Plaintiff understood this meant that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

116.   Defendant's representations affirmed and promised that the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

117.   Defendant described the Product so Plaintiff believed it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, which became part of the basis of the bargain that it would conform to its affirmations and promises.

118.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

119.   This duty is based on Defendant's outsized role in the market for this type of Product, a trusted brand known for the highest quality products.

120.  Plaintiff recently became aware of Defendant's breach of the Product's warranties.

121.  Plaintiff provides or will provide notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties associated with the Product.

122.  Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

123.  The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

124.  The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

125.  The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

126.  Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

127.  Defendant had a duty to truthfully represent the Product, which it breached.

128.  This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted brand known for the highest quality products.

129.  Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

130.  These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

131.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

132.  Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

133.  Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

134.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

135.  The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

<u>Unjust Enrichment</u>

136.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek

restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

3. Awarding monetary, statutory and/or punitive damages pursuant to statutory and/or common law claims;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated:   September 5, 2022

                                    Respectfully submitted,

                                   /s/Spencer Sheehan
                                 Sheehan & Associates, P.C.
                                 60 Cuttermill Rd Ste 412
                                 Great Neck NY 11021
                                 Tel: (516) 268-7080
                                 spencer@spencersheehan.com